UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROBERTA K. FAUL,

                        Plaintiff,

      v.                                       06-CV-1169

JOHN E. POTTER, Postmaster General
of the United States Postal Service, a
Federal Agency,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiff commenced the instant action pursuant to 42 U.S.C. § 2000e, et seq. claiming that she was retaliated against for engaging in protected activity. Presently before the Court is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

**I.    FACTS**

In 1986, Plaintiff began working as a casual-temporary employee for the United States Postal Service ("USPS") in Watertown, New York. After three months, she became a part-time flexible carrier in Carthage, New York. In approximately 1991, Plaintiff became a part-time flexible clerk.[1] By 2002, Plaintiff was a full-time clerk.

In May 2002, Plaintiff filed an information for pre-complaint counseling. Plaintiff alleged gender-based discrimination on the ground that male employees were allowed to

---

[1] Carriers carry the mail. Clerks sort mail and work the post office window.

create overtime for themselves, whereas females were not. Specifically, Plaintiff alleged that males were able to take "no lunches," but females were not. This complaint was resolved among the parties in June 2002 whereby Jeff Sands, the postmaster of the Carthage office,[2] would hold service talks concerning a uniform "no lunch" policy.

In November 2003, the Carthage Post Office underwent a review of its staffing and scheduling needs. This audit consisted of a three day review conducted by postal employees that did not work in the Carthage office. After concluding its review, the audit team recommended "to excess the junior Regular [clerk]," which was Plaintiff's position. Def.'s Ex. I.

In March 2004, Plaintiff filed an information for pre-complaint counseling alleging gender-based discrimination and retaliation. The bases for this complaint were that: (1) on March 3, 2004, Plaintiff received a notice that her position was going to be excessed; (2) her scheduled days off were changed; (3) she had consistently been denied a higher level of pay; and (4) management violated the earlier settlement agreement. In May 2004, Plaintiff supplemented her complaint alleging that her scheduled hours had been disadvantaged and that she received a warning letter for "failure to follow instructions."

In October 2004, Plaintiff was issued a notice of seven-day suspension for failing to follow instructions resulting in a delay of mail delivery. The claimed basis for the suspension was that Plaintiff failed to follow Sands's directive that she sort the earlier mail before sorting the later mail. Plaintiff grieved the notice of suspension, which was ultimately rescinded.

---

[2] Plaintiff identified Sands as the person responsible for discriminating against her (and other females) at the Carthage Post Office and engaging in the alleged retaliatory conduct at issue here.

In November 2004, Plaintiff filed an information for pre-complaint counseling alleging gender-based discrimination and retaliation on the ground that she received a notice of a seven-day suspension for failure to follow instructions. On or about November 24, 2004, Plaintiff filed a formal complaint of gender-based discrimination and retaliation.

Plaintiff then commenced the instant action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., asserting claims of retaliation for engaging in protected activity. Presently before the Court is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

## II.     STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedures governs motions for summary judgment. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve

in her favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). With this standard in mind, the Court will address Defendant's motion.

## III.      DISCUSSION

Although Plaintiff presented various discrimination complaints at the administrative level, the only issue in this suit is whether Defendant retaliated against her by excessing her job in April 2004 and suspending her for seven days in October 2004. See Pl.'s Mem. of Law at 2.[3]

### a.      Retaliation

Plaintiff contends that Defendant retaliated against her for filing charges of gender-based discrimination. To succeed on a retaliation claim, Plaintiff must demonstrate that: (1) she participated in a protected activity known to Defendant; (2) Defendant took an adverse action against her; and (3) there exists a causal connection between the protected activity and the adverse action. Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007).

---

[3] Because Plaintiff expressly states that "[s]he advances one cause of action against the Postal Service for violating the anti-retaliation provisions of Title VII. . . " the Court does not address the arguments raised by the government as to other claims it believed Plaintiff to be asserting. Through the statements, arguments, and factual concessions raised and made in Plaintiff's opposing memorandum of law and statement of material facts, the Court deems any other claims as abandoned. See Pl.'s Mem. at 16 ("The specific issue is whether Sands' excessing of Plaintiff's position in March 2004, or the seven-day suspension he gave her in September 2004, were motivated by retaliatory animus stemming from earlier complaints of sex discrimination.").

### 1.     Protected Activity

Defendant concedes that, by filing EEO claims, Plaintiff engaged in protected activity of which it was aware. Accordingly, this element is satisfied.

### 2.     Adverse Action

Defendant concedes that the excessing of Plaintiff's job constitutes an adverse action. Defendant argues, however, that the proposed seven-day suspension does not constitute an adverse action because the suspension was never implemented and the proposed suspension was withdrawn following Plaintiff's grievance of it. Plaintiff claims that the proposed seven-day suspension does constitute an adverse action because it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Generally speaking, an employment action is sufficiently adverse if the plaintiff has suffered a materially adverse change in her employment status or in the terms or conditions of her employment. Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 206-07 (2d Cir. 2006). Claims of retaliation, however, are "not limited to discriminatory actions that affect the terms and conditions of employment." Kessler, 461 F.3d at 208 (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2412-13 (2006)). An action also may be adverse if a plaintiff can show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Kessler, 461 F.3d at 207.

Here, Plaintiff did not suffer any change in the terms or conditions of her employment. While she received a notice of a seven-day suspension, the suspension was rescinded before it was implemented. Plaintiff was never suspended, her compensation was never changed, and she does not identify any other material change in the terms or

conditions of her employment. That leaves the issue of whether the issuance of a proposed suspension was "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." Kessler, 461 F.3d at 209 (quoting White, at 2409).

Plaintiff fails to proffer sufficient evidence from which it reasonably may be inferred that, under the facts and circumstances of this case, a reasonable worker in Plaintiff's position would have been dissuaded from making a charge of discrimination based on a notice of seven-day suspension. See Cheshire v. Paulson, 2007 WL 1703180, at *6 (E.D.N.Y. 2007); Graham v. Johanns, 2008 WL 3980870, at *9 (S.D. Ohio 2008) (letter proposing removal which was later rescinded does not constitute an adverse employment action); Brown v. City of Cleveland, 2007 WL 915168, at *10 (N.D. Ohio 2007); Mitchell v. Yates, 402 F. Supp.2d 222 (D. D.C. 2005) (proposed action does not constitute adverse employment action); Moore v. Potter, 353 F. Supp.2d 410, 415 (E.D.N.Y. 2005); see also McMillian v. Potter, 130 Fed. Appx. 793 (6th Cir. 2005) (proposed letter of warning issued to postal worker did not meet the definition of adverse employment action); Watkins v. Hill's Pet Nutrition, Inc., 63 Fed. Appx. 185 (proposed suspension does not constitute adverse employment action). Aside from the proposed suspension, she does not offer any evidence of conduct by Defendants likely to dissuade reasonable employees from complaining of discrimination. In fact, the evidence is quite the contrary. While the test is an objective one, the evidence before the Court is that Plaintiff herself filed a charge of discrimination concerning the proposed suspension, thereby negating any suggestion that a reasonable employee would be dissuaded from filing a complaint of discrimination. Cheshire, 2007 WL 1703180, at *6. This case is unlike White, where, although the employee was ultimately

reinstated to work with full back-pay, she had to live for 37 days without income and without knowing whether or when she could return to work.  White, 126 S. Ct. at 2417.  The present case also is quite different from Kessler where, although the employee retained the same job title, he was reassigned to a position where he was stripped of certain important responsibilities, not allowed to perform certain functions, and performed work equivalent to persons several grades below his position.  Kessler, 461 F.3d at 209.  Here, Plaintiff identifies no such adverse consequences to her.  Accordingly, Plaintiff has not met her burden of demonstrating that, under the facts and circumstances of this case, the proposed suspension would have dissuaded a reasonable employee from complaining about discrimination (or retaliation).  The Court, therefore, finds that the proposed seven-day suspension does not constitute an adverse employment action and that the retaliation claim based on the proposed suspension must be dismissed.

### 3. Causal Connection

Defendant next contends that there is no causal connection between the decision to excess Plaintiff's job or, alternatively, that it had a legitimate, non-discriminatory reason for excessing Plaintiff's position.  According to Defendant, the determination to excess her position was made as a consequence of a Function Four audit designed to review performance indicators, including staffing needs.  Defendant has submitted the affidavit of Deborah Oeser, the Acting Function 4 Coordinator for the Albany District, who states that the Carthage Post Office was selected for a Function Four audit because it was over budget, it had not been audited for five years, and the implementation of "Delivery Point Sequence" mail since the last audit decreased the manual letter volume and workload, thereby warranting a review of the Carthage Post Office's staffing needs.  Oeser stated that, as a

result of the audit, "the team recommended the excessing of one full time regular ("FTR") clerk because of the limited workload that existed after 9:00 a.m." The audit determined that the junior regular full-time clerk position should be excessed. This is a legitimate, non-discriminatory reason. See Holcomb v. Iona College, 521 F.3d 130, 141 (2d Cir. 2008) ("It is not our task, at the second stage of the McDonnell Douglas framework, to assess the credibility of [the Defendant's] . . . witnesses; nor is it our role to determine whether the [Defendant's] explanation of its action is convincing. . . . Instead, we ask whether defendant has introduced evidence that, taken as true, would permit the conclusion that there was a nondiscriminatory reason.") (internal citations and quotation omitted).

Having asserted a legitimate, non-discriminatory reason, Plaintiff may no longer rely on any presumption created by establishing a prima facie case of discrimination and must point to "sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision [to excess her position] was based, at least on part, on the fact that [she filed complaints of discrimination]." Holcomb, 521 F.3d at 130. One way Plaintiff may satisfy her burden is by showing that Defendant's stated reason was a pretext for unlawful retaliation.

Here, Plaintiff maintains that the Function Four Audit was a pretext. She claims that the audit was a "sham" and was conducted for the purposes of devising a way to eliminate her position. The bases for Plaintiff's contention are that Sands took the unusual step of requesting a Function Four Audit of his own office; the audits invariably results in staffing cuts; and Sands selected the slowest mail delivery period to conduct the audit.

Although Plaintiff raises questions concerning the reasoning for, and validity of, the Function Four Audit, for the following reasons, she fails to demonstrate that the reasons for

the audit, or the results thereof, were false, that they were a pretext for unlawful retaliation, or that her position was excessed because of her earlier complaints of discrimination.  First, assuming that it was Sands who made the decision to have a Function Four audit, there can be no inference of unlawful retaliation drawn in this case based on the time between the protected speech and the decision to have a Function Four audit.  Plaintiff's protected speech occurred in May 2002, March 2004, and November 2004.  The decision to have a Function Four audit was made in or about September 2003, long after the 2002 protected conduct and well before the 2004 protected conduct.  The Function Four audit was performed in November 2003.  Under the facts and circumstances of this case, the significant passage of time between the conclusion of Plaintiff's May 2002 protected conduct[4] and the 2003 decision to have a Function Four review does not give rise to an inference of impermissible retaliation.  See Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free School Dist., 411 F.3d 306, 314 (2d Cir. 2005).  Similarly, the decision to excess Plaintiff's position was made in early 2004, long after her May 2002 complaints and before her March 2004 complaint.[5]  Although Plaintiff's position was not excessed until a later time, the decision to excess her position occurred prior to March 2004.

Second, it is far from clear that it was Sands who made the decision to implement a Function Four audit in the Carthage Post Office.  Although there is some basis in Sands's deposition testimony to conclude that he was involved in the decision-making process,

---

[4] Plaintiff's May 2002 complaint was resolved via mediation in June 2002.

[5] The March 2004 complaint was about the decision to excess her position.

- 9 -

Carney testified that it was she who asked operations support to perform the audit.[6] Similarly, Oeser states in her affidavit that she, along with Dennis Loehner, the Manager of Operations Programs Support, decided to conduct the Function Four audit of the Carthage Post Office. This is consistent with the deposition testimony of Sands who testified that "[t]he [small office standardization] group [that was meeting at the Utica Post Office] was discussing potential sites for Function 4s . . .[,] [t]he group suggested Carthage, and I said, you know, it could happen. You know, I said it's a potential site." Sands Dep. at 133.[7]

Third, Sands, Carney, and Oeser all provided similar reasons for the audit, including that the Carthage Post Office was over budget hours,[8] it had not been audited since

---

[6] At deposition, Carney was asked the following questions and gave the following answers:

Q: And who was it that requested a Function 4 Audit for Carthage?

A: I believe I asked op support to do one. . . .

Q: And what led you to ask op support for it?

A: It was a combination of things that - the small office standardization, looking at budget performance, productivities. I'm thinking there was a question on how it could be that in the clerk craft they could be 3 percent or maybe 2.9, 3 percent rounded off, over their budget in work hours, but nearly 10 percent reduction in the manual distribution volume. . . .

Q: Well, isn't it true that Jeff Sands asked you for a Function 4 Audit in Carthage?

A: I think he wanted one, too, yes. . . .

[7] Sands did testify at deposition that it was possible that he suggested a Function Four Audit in Carthage.

[8] Oeser states that the Carthage Post Office was budgeted 5675 hours, but used 5935. Plaintiff cites to her Exhibit 81 which, she contends, shows that, as of November 2003, the Carthage office was 5.9% under budget. Assuming this to be true for purposes of this motion, the decision to conduct the Function Four audit was not made in November 2003, but several months earlier (probably September 2003, Oeser Aff. at ¶ 7). It is unclear from the record what time period is looked at to determine whether to conduct a Function Four audit. It is implausible, however, to suggest that the appropriate numbers are those from during, or after, the audit was conducted. In any event, Plaintiff's Exhibit 81 expressly notes that any improved efficiencies in 2003 were the result of changes to clerk schedules and "a concerted effort . . . to identify inefficient practices and . . .to eliminate those

(continued...)

1998, and the implementation of certain automated processes warranted a review of staffing needs.

Fourth, contrary to Plaintiff's contention, although requesting a Function Four audit of one own's office may be rare, it was not entirely unheard of. Charney was aware of another instance where a postmaster had requested a Function Four Audit of his or her own office, although that audit had not taken place as of the date of Charney's deposition. Charney Dep. at 73.

Fifth, the Carthage Post Office was not the only office undergoing a Function Four audit at the time. There is evidence in the record that, consistent with the affidavit of Oeser, several offices in the Albany District were undergoing Function Four Audits, the result of which were the excessing of positions.[9] See Landry Dep. at 15-17; Brenon Dep at 26-27 ("[O]ur Lowville office lost a clerk, so did Gouvernour."). There is no claim or evidence suggesting that the Function Four audits in the district were aimed at Plaintiff or a concerted effort to retaliate against persons for engaging in protected speech.

Sixth, assuming it was Sands who requested the Function Four Audit, he was not personally involved in conducting the audit or devising the recommendations resulting from the audit. Further, it was the recommendation of the audit team (not Sands) in November 2003 to excess a regular, full-time clerk position and, in particular, "the junior Regular." Def.'s Ex. I. This recommendation was made before any further protected conduct by

---

[8](...continued)
practices," thereby substantiating Defendant's contention that it was undergoing efforts to improve efficiency in the Carthage office.

[9] In her affidavit, Oeser states that "[i]n FY 2004, the Function 4 team performed a total of twenty (20) Function 4 audits, including the Carthage Post Office."

Plaintiff in March 2004. There is no evidence in the record suggesting a conspiracy between Sands and the audit team or that the members of the audit team were seeking to remove Plaintiff from her position with the post office for reasons related to her protected speech.

Seventh, although Plaintiff contends the Function Four Audit is supposed to be an eight week assessment and there may be some evidence supporting that conclusion,[10] the undisputed testimony was that, in the Albany district (which includes the Carthage Post Office), the audits were routinely three day assessments. This is precisely what was done at the Carthage office. Even assuming the Function Four audits are supposed to be eight week assessments, Plaintiff offers no evidence that the Function Four Audit at Carthage was conducted any differently than Function Four audits at others offices within the Albany district (or anywhere else).

Eighth, Plaintiff claims that the audit was specifically conducted during a period of time when the Carthage Post Office was slow. In support of this argument, Plaintiff sites to deposition testimony indicating that management can predict when mail volume is highest. Assuming that management does know when mail volume is highest or lowest, Plaintiff points to nothing suggesting that the Carthage Audit was conducted during a slow period or that the dates actually selected were selected because it was a slower period of time. Moreover, there is insufficient evidence from which it reasonably may be inferred that Sands had any influence concerning when the audit was actually performed.

For the foregoing reasons, the Court finds that Defendant has proffered a legitimate, non-retaliatory reason for excessing Plaintiff's position; Plaintiff has failed to

---

[10] The evidence submitted by Plaintiff does not indicate to what types of reviews or audits it applies.

identify sufficient evidence upon which a fair-minded trier of fact could reasonably conclude that Defendant's stated reason was a pretext for unlawful retaliation; and Plaintiff has otherwise failed to identify sufficient evidence upon which it reasonably could be concluded that her position was excessed, at least in part, because of her having previously filed complaints of discrimination. Accordingly, her claim of retaliation based on the excessing of her position is dismissed.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and the Complaint is DISMISSED IN ITS ENTIRETY.

IT IS SO ORDERED.

Dated: November 5, 2008

_____
Thomas J. McAvoy
Senior, U.S. District Judge